UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHARON GREEN,

        Plaintiff,

   v.

CAROLYN W. COLVIN,

        Defendant.

Case No. 16-cv-04716-WHO

**ORDER GRANTING PLAINTIFF'S MOTION AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 19, 20

## INTRODUCTION

Plaintiff Sharon Green appeals the denial of disability and supplemental security income benefits by the Social Security Administration, arguing that the Administrative Law Judge ("ALJ") erred in failing to consider or adequately consider Green's severe impairments and impermissibly discounting treating sources and her subjective testimony. The SSA Commissioner cross-moves for summary judgment, arguing that the ALJ's denial should be affirmed. I agree with Green that the ALJ failed to consider several of her impairments and improperly rejected the opinions of her treating therapist and examining psychologist, misread the notes of the doctors and physician's assistant who treated her chronic pain syndrome, and erroneously discounted her testimony about the significance of her pain and extent of her limitations. Green's motion is GRANTED, the Commissioner's motion is DENIED, and this case is remanded for further proceedings consistent with this Order.

## BACKGROUND

### I. PROCEDURAL BACKGROUND

Green filed Tile II and Title XVI applications for benefits on September 21, 2012, for disabilities she claims began on August 1, 2009. Administrative Record ("AR") 18. Her application was denied initially on March 6, 2013 and denied on reconsideration on September 23, 2013. *Id.* Green filed a request for a hearing, and on December 15, 2014, she testified at and was represented by counsel at the hearing before Administrative Law Judge Nancy Lisewski. *Id.* The

ALJ denied Green's claim in a decision dated January 22, 2015. AR 18-30. On August 17, 2016, Green commenced this action seeking judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). AR 19.

## II.     PLAINTIFF'S CONDITIONS

Green is a 46-year-old woman who lives with her two young sons in Alameda County. AR 39-44. She has no record of gainful employment since August 1, 2009. AR 58. She was previously employed as a security guard, data entry clerk, collections clerk, and hair braider. AR 28. She contends that she suffers from several severe physical impairments, including chronic back, neck, and shoulder pain and debilitating headaches. AR 317-18, 324-25, 532-34, 577-78, 809. She also asserts that she suffers severe mental impairments, including depression, bulimia, and posttraumatic stress disorder ("PTSD"). AR 796, 810. She endured several traumatic events from her childhood and her first marriage, including repeated episodes of physical and emotional abuse, along with psychological trauma and head trauma. AR 309, 421-23, 578, 780, 786, 795, 809-810.

### A.     Physical Medical Evidence

Green saw Dr. Aubrey A. Swartz, an orthopedic surgeon, from March through September 2007. AR 285-94. During her visits, Green complained of chronic pain related to a bus accident. AR 286, 290. Dr. Swartz was not able to "corroborate" the subjective complaints but referred her for physical therapy and then chiropractic treatments. AR 287, 288. In his last treatment note from September 14, 2007, Dr. Swartz concluded that Green's primary problem was depression and that there was no further treatment she could provide her. *Id.*

In 2008, Dr. Judy Bertelsen examined Green, concluding that Green was limited (occasionally, frequently) in her physical capacities based on plaintiff's own reports. Dr. Bertelsen was unable to fully evaluate Green because of the limited time allowed for clinical appointments. AR 296-98.

There are extensive records of Green being treated through the Alameda County Medical Center ("ACMC") at the Alameda Ambulatory Care Eastmont Wellness Center and at Highland Hospital from 2008 to 2012, and starting again in 2014. AR 352-614. Green went to the ACMC

1   irregularly, sometimes several times in a month and other times not for months.[1]  During her

2   visits, Green generally complained about chronic pain due to various accidents, and was

3   prescribed pain medications, acupuncture, and physical therapy.  AR 339, 352 (October 2012), AR

4   354 (September 2012), AR 356 (July 2012), AR 359 (April 2012), AR 363 (January 2012), AR

5   343 (November 2011), AR 372 (September 2011), AR 317 (April 2011), 318-19 (January 2010),

6   AR 534-38 (October through December 2009), 321-25 (March 2009), 327 (June 2008), AR 328

7   (January 2008).

8        In September 2008, severe degenerative disk disease was present at L5-S1.  AR 472-73.

9   Throughout 2011 and 2012 Green saw Amy Smith, a physician's assistant (PA) whose clinic notes

10   were signed off by Dr. Howard Kornfeld in the pain clinic.  Green was consistently prescribed

11   Vicodin, Depakote, and Butrans patches among other pain medications, as well as anti-anxiety

12   medicines.  *See, e.g.*, AR 352, 525, 558, 559, 567.  In August 2011, Dr. Kornfeld diagnosed Green

13   with a severe degenerate disc disease but opined that her extreme level of pain likely was

14   connected to her psychological impairments. AR 581.  By mid-2012, Green was suspected of

15   having fibromyalgia, with the first indications being recognized by Dr. Kornfeld in September

16   2011.  *See, e.g.*, AR 352, 558, 559, 563, 570, 572, 658, 670, 673, 703, 740, 780.  At the inception

17   of her treatment with the pain clinic in 2011, Green was referred to and apparently frequently

18   received "psychoeducational" services.  AR 574-75 (September 2011), 663 (July 2012).  Green

19   stopped visiting the pain clinic in late 2012 when she was pregnant with her second son because

20   she didn't want to continue on the pain medications, but she resumed treatment there in 2014. AR

21   770; *see also* AR 740 (May 2013 note).

22        On April 27, 2010, Green had a comprehensive medical evaluation performed by Dr. Siar

23   Ayoubi at the Eastbay Medical Evaluation Service. AR 299-307.  At the evaluation, Green

24   complained of back, neck, shoulder, foot, and knee pain and asthma.  AR 299.  She reported that

25   she had chronic pain due to a past bus accident and was receiving treatment, including steroid

---

[1] There are additional medical records from Highland Hospital from 2001 through 2007, including records of injuries stemming from an assault by Green's boyfriend in 2005, but those are not relied on in support of her claim at this juncture.  AR 377 – 465.

injections, from a pain specialist. She was taking a number of pain medicines. AR 299-300. Dr. Ayoubi was unable to conduct a full examination, and considered some of his observations unreliable, because plaintiff's pain prevented him from testing range of motion and because Green was sensitive to palpitations. However, he saw that Green was able to bear weight on a crutch and able to negotiate stairs in and out of the clinic. AR 300-301. Dr. Ayoubi found Green mildly limited in her activities and concluded that Green could sit for 6 hours in an 8-hour work day and could only stand for less than two hours. AR 301.

In January 2013, Green was evaluated at the Bayview Medical Clinic Internal Medicine by Dr. Eugene McMillan. AR 620. Her main complaint was back pain, that she stated was worsened by her pregnancy, and Dr. McMillan reported that she was using a cane. AR 620-22. Dr. McMillan made a functional capacity assessment that Green was limited in her ability to move, could not carry more than 10 pounds, would need a cane when leaving her home, and could walk for about two hours during an eight-hour workday and could sit for six hours. AR 623. Dr. McMillian reported that Green was not limited in moving machinery or with reaching in all directions. *Id.*

On March 5, 2013, Dr. Patty Rowley, a Disability Determination Service ("DDS") medial consultant, reviewed Green's records. AR 66-76. Dr. Rowley opined that Green could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and stand and/or walk for six hours in an eight-hour workday. AR 72-73. Dr. Rowley also opined that Green was not disabled, but was limited to sedentary work. AR 75.

On September 18, 2013, Dr. Jonathan F. Nordlicht, a DDS medial consultant, performed a second functional capacity assessment based on a review of Green's medical records. AR 105-116. *Id.* Dr. Nordlicht diagnosed Green with severe fibromyalgia and reported that Green had an exertional limitation of chronic back pain, without providing details of how Green was limited. AR 111, 113. Dr. Nordlicht opined that Green could occasionally lift and/or carry 20 pounds, could frequently lift and/or carry 10 pounds, could stand and/or walk for four hours in an eight-hour workday, and could sit for six hours in an eight-hour workday. AR 113. Dr. Nordlicht concluded that Green was not disabled and could adjust to other work, and stated that Green was

4

limited to sedentary work. AR 115.

On April 29, 2014, Dr. Bruce Fitzgerald at the ACMC examined Green. He documented Green's complaints of suffering from chronic body pain, including pain in her neck, back, and upper extremities. AR 770. Dr. Fitzgerald documented that she wanted a referral to go back to the pain clinic, and that she had stopped going there a little over a year prior when she was pregnant. AR 770. Dr. Fitzgerald referred her to the pain clinic and prescribed her Tramadol, Neurontin, Vicodin, and Robaxin. *Id.*

On September 8, 2014, Dr. Fitzgerald reported that Green complained of chronic body pain. AR 754. Dr. Fitzgerald also reported that Green had a history of fibromyalgia, and suffered from chronic depression, chronic emotional stress, and anxiety. *Id.* Dr. Fitzgerald opined that Green's pain had a psychological component. *Id.* Dr. Fitzgerald prescribed her Motrin, Robaxin, Tramadol, and Norco. *Id.* Dr. Fitzgerald again referred Green to the pain clinic for evaluation and treatment. AR 755.

**B.     Psychiatric Medical Evidence**

**a.     Dr. Kollath**

On June 06, 2010, Green underwent a Mental Status Evaluation performed by Dr. Ute Kollath, a clinical psychologist. AR 308-13. Dr. Kollath's diagnostic impression was that Green had a depressive disorder. AR 311. Through checking boxes, Dr. Kollath found that Green was mildly impaired in her ability to interact with others in a work environment on a regular basis and in her ability to "adapt to changes, hazards, or stressors in workplace setting," and opined that Green was unimpaired in her other work-related abilities. AR 311-12. Dr. Kollath found Green to have "[n]o functional disruption due to a cognitive disorder" and to be cooperative. AR 311. Under level of functioning, Dr. Kollath noted that Green stated she was not independent for her basic activities of daily living ("ADL"), she needed help preparing meals, was unable to drive, was able to make change, and that she spends her days resting at home. AR 310.

On January 28, 2013, Green underwent a second Mental Status Evaluation performed by Dr. Kollath. AR 615-19. In this evaluation, Green reported being depressed and stated that she attempted suicide when she was 15 years-old. AR 616. She also reported that she suffered from

5

chronic back pain, experienced "acute physical pain," had trouble sleeping, was anxious, and was prone to mood swings. *Id.* Dr. Kollath reported that Green was obese, was friendly and cooperative, had good eye contact, and that "she interacted appropriately with the examiner." AR 615-16. Dr. Kollath marked that Green had fair intelligence and that her attention and concentration were average. AR 617. Dr. Kollath found that Green was independent for basic ADLs, as she described preparing meals, being able to drive, and being able to make change. AR 617. Dr. Kollath also considered that Green was the primary caretaker for her two young children and that she had adequate concentration. *Id.* Dr. Kollath opined through checking boxes that Green was unimpaired in her ability to perform mental work-related activities and in social functioning. AR 617-18. Dr. Kollath's opinion was based on his clinical interview, observation, Green's personal history, and unspecified accompanying documents. AR 618.

### b.    Dr. Combs and Ms. Wong

On October 3, 2014, Green had a health psychology intake evaluation at ACMC performed by attending psychologist Dr. Hilary Combs and Ms. Joanne Wong, an M.A. psychology trainee. AR 780. Green reported being depressed and suffering from sleeping issues and bulimia that she believed were caused by trauma, including being sexually assaulted. AR 780. Dr. Combs and Wong reported that Green had a history of chronic pain and fibromyalgia. *Id.* Green was diagnosed with bulimia, PTSD, depression, cannabis dependence, chronic pain, and fibromyalgia. *Id.*

On October 31, 2014, Green underwent a follow-up psychiatric evaluation with Dr. Demedick Anton Bland with Dr. Combs attending. AR 782. Dr. Bland reported that Green was present with her toddler son. *Id.* She reported being depressed, had problems sleeping, and was using cannabis daily. *Id.* Dr. Combs marked that she had average intelligence, was average in her eye contact, her cognition was within normal limits, but that her judgment was impaired "to make reasonable decisions." *Id.* Dr. Combs stated that Green would likely benefit from taking anti-depressants but that it would be difficult to determine a dosage given her daily use of cannabis and indifference to stopping, and that she should be encouraged to seek addiction counseling. AR 783. Dr. Combs noted that Green had been receiving "Health Psychology" therapy and recommended

that it continue. *Id.* Dr. Combs had no opinion of Green's level of disability due to her mental health conditions. *Id.*

### c. Dr. Thomsen

In November 13, 2014, Green underwent a psychological evaluation by Dr. Ede Thomsen. AR 785-99. Green reported being homeless for five years, beginning in 2008. AR 786. She disclosed that she was sexually assaulted by her half-brother from the age of eight to sixteen or seventeen years-old and had experienced psychological symptoms since she was a child. *Id.* She reported being hit in the head with a hammer several times by her half-brother in her early twenties, being abused by her ex-husband, and that she felt threatened by others. *Id.*

Dr. Thomsen opined that due to Green's traumatic experiences she has symptoms of PTSD, including hypervigilance, flashbacks, nightmares, stimuli avoidance, and intrusive thoughts about the abuse. AR 795. Dr. Thomsen also diagnosed Green with major depressive disorder, cannabis abuse, bulimia, dependent personality disorder, schizotypal personality disorder, chronic pain, and a deficit in ability to concentrate. AR 795-96. Dr. Thomsen found that "psychiatric symptoms, in conjunction with [Green's] cognitive deficits, interfere with her ability to make decisions, resolve problems, and effectively manager her daily affairs." AR 795.

Thomsen further opined that due to Green's "severe mental health problems . . . her ability to be successful at a job site [is] limited." AR 795. The doctor also discussed Green's noticeable social impairments, noting that she has difficulty interacting with others, few close relationships, an "indifference to the actions and feelings of others," and difficulty being in a relationship. AR 793. Dr. Thomsen stated that Green's severe mental health problems caused her to be limited in her ability to work and "could not sustain complex tasks for up to eight hours." AR 795-96. Dr. Thomsen indicated that Green is severely limited in her judgment/insight and activities of daily living. AR 798.

Dr. Thomsen expressly criticized the 2010 finding by Dr. Kollath that Green was not or was only mildly impaired in work activities because that was contrary to the results of the intelligence and memory tests administered by Dr. Kollath. Dr. Thomsen also disagreed with Dr. Kollath's 2013 opinion that Green was not limited because Dr. Kollath did not run any

psychological tests in 2013 to support his opinion. AR 787. I n contrast, Dr. Thomsen ran eight different tests, performed two additional evaluations, reviewed all of Green's records, and issued an eleven-page, thorough assessment of Green's abilities and impairments. AR 786-96.

### d.    Ms. McKenzie, MFT

On November 20, 2014, Alison McKenzie, a Marriage and Family Therapist (MFT) at the Alameda County Department of Public Health, wrote a detailed letter based on her bi-weekly counselling and psychotherapy sessions with Green that began in February, 2014. AR 800-802. McKenzie also completed a Mental Health Questionnaire. AR 803-809. McKenzie diagnosed Green with the severe bulimia nervosa, PTSD, and recurrent major depressive disorder. AR 800. McKenzie opined that these issues "make it very difficult" for Green to function in a work environment. *Id*. McKenzie opined that Green's mental health issues began in adolescence because of sexual abuse and being in a dysfunctional family, and that her experience of domestic violence as an adult exacerbated her PTSD and depression. AR 800. McKenzie characterized Green's bulimia as "life-threatening and chronic." *Id*.

McKenzie stated that Green's PTSD symptoms, such as hypervigilance, would also make it difficult to function in a work setting, and that due to Green's "severe mental health issues," if she were in a "competitive work environment" she would likely have frequent absences and tardiness due to bulimia-related symptoms. AR 801. McKenzie concluded that Green suffers from "chronic and debilitating pain due to her history of domestic violence, including head trauma, neck and back injuries; as well as fibromyalgia." AR 801. McKenzie reported that Green uses cannabis three to four times a day to cope with mental health issues, such as stress and trouble sleeping, but that this does not contribute to her mental health symptoms. AR 801.

Additionally, McKenzie opined that Green would be precluded from working 30 percent of a five-day, 40-hour work week due to her mental limitations. AR 808. McKenzie found that Green suffered from several marked impairments in socially interacting, performing daily activities, and maintaining concentration and pace. AR 805-807. She also marked that Green's impairments are expected to last at least 12 months. AR 808.

### e.     Dr. McShane

On November 5, 2014, Dr. Johanna Marie McShane performed an assessment of Green to determine treatment options.  AR 809-13.  Green reported suffering from chronic pain and taking Vicodin daily.  AR 809.  Green also reported having a history of sexual abuse and a dysfunctional family, bulimia, problems with alcoholism when she was fifteen years-old, and an eating disorder, which she stated was triggered by her being sexually assaulted by her half-brother.  AR 809.  McShane opined that Green would benefit from anti-depressants, that her bulimia is serious, and that she suffers from PTSD and depression.  AR 812.

Dr. McShane recommended that Green join a therapy group for her trauma, her eating disorder, and for general help.  AR 811-13.  Dr. McShane indicated that Green would be a good candidate for psychotherapy, that she needs help changing her diet, and that she should seek treatment for her bulimia.  AR 811-13.  Dr. McShane noted that besides Green's fear, her chronic pain and having to use public transportation create the biggest obstacles for Green obtaining the treatment she needs, and recommended that she receive in-home care.  AR 813.

## III.     ALJ DECISION

The ALJ found that Green met the insured status requirements of the Social Security Act through December 21, 2015, and that Green had not engaged in substantial gainful activity since August 1, 2009.  AR 20.  The ALJ, however, concluded that Green had only the following severe impairments: degenerate disc disease of the lumber spine and obesity. *Id.*   The ALJ concluded that Green had not provided enough medical evidence to establish that she suffered from "severe" fibromyalgia.[2]  The ALJ also found that Green's pregnancy and gestational diabetes caused by the pregnancy only created a minimal and temporary limitation.  AR 21.

The ALJ concluded that the record does not support Green's allegations of severe depression (including allegations of hopelessness, staying in bed after she has sent her children to school, being suicidal at times, not sleeping well, complications with memory and concentration, and not being able to get along with others).  Nor did she accept Green's allegations of having an

---

[2] Under SSA regulations, evidence of a fibromyalgia diagnosis must come from an acceptable medical source based on evidence of at least 11 positive tender points on physical examination. The ALJ believed that evidence was missing from the record.

eating disorder.  AR 21.  The ALJ found that except for "very recent" treatment in October 2014, "there is no evidence of any mental health treatment for counseling in the record."  *Id.*

The ALJ, instead, focused on the June 2010 and January 2013 psychological examinations by Dr. Kollath that concluded that Green was not limited by her "mild" depressive disorder.  AR 21-22.  The ALJ noted Green's October 2014 intake examination at the ACMC and the psychological evaluations by Dr. Thomsen and MFT McKenzie from November 2014, AR 22, but concluded that while the record suggests that Green's depressive disorder symptoms "might have worsened" in October 2014, "there is insufficient evidence to show that it caused more than a minimal limitation on her ability to perform basic work activities for a continuous period of 12 months." *Id.*  Instead, the ALJ reiterated her opinion that there is no record of "mental health treatment" of any kind prior to 2014.  AR 22.

The ALJ considered Dr. Thomsen's diagnosis that Green suffers from cannabis abuse and Green's self-reports regarding her use.  AR 22.  However, the ALJ determined that there is "no medical evidence that suggests that the claimant's cannabis abuse cause more than a minimal limitation" to perform work activities. *Id.*  The ALJ concluded that Green's depressive disorder, PTSD, and cannabis abuse, whether considered individually or in combination, do not cause Green to be more than minimally limited to perform work activities.  AR 23.

The ALJ then considered the four broad functional areas set out in the SSA regulations for evaluating mental disorders.  As to "activities of daily living," the ALJ found no limitation in Green's ability.  AR 23.  The ALJ compared Green's report to Dr. Kollath in June 2010 that she needed her family's help with caring for her child and household chores to Green's 2013 statement to Kollath that she was independent for daily living, could prepare meals, and could drive. *Id.*  The ALJ also pointed out that Green has two children for whom she is the primary caretaker, and that she does so with little help. *Id.*  Therefore, the ALJ found Green was not limited in daily living. *Id.*

As to "social functioning," ALJ found that Green had no limitation.  AR 23.  She supported her finding by dismissing Dr. Thomsen's contrary opinion because Thomsen's opinion was supported by "little evidence."  Instead, the ALJ relied on the fact that "Dr. Kollath and Hilary

Combs both observed that the claimant had good eye contact and a cooperative attitude during their examinations" and that Dr. Kollath opinioned that Green was not impaired in social functioning. *Id.*

As to "concentration, persistence or pace," the ALJ found that Green had no impairment. AR 23. The ALJ acknowledged the opinion of Dr. Thomsen that Green was impaired in this regard, but instead relied again on Dr. Kollath and Dr. Combs' observations that Green was not impaired in her ability to pay attention and concentrate and found her to have average intelligence, as well as Dr. Kollath's opinion that Green was not impaired in this area. *Id.*

Finally as to decompensation, the ALJ noted that claimant had no history of periods of decompensation or hospitalizations or emergency treatment for mental health issues. AR23.

She concluded that Green's "medically determinable mental impairments" caused no more than "mild" limitations, and therefore were nonsevere. AR 23. In reaching that determination, the ALJ gave "great weight to the 2010 and 2013 opinions of Dr. Kollath" who found that Green has no impairments or mild impairments. AR 24. The ALJ justified the weight she gave to Dr. Kollath because he examined Green twice. She believed that Dr. Kollath's examinations were the most thorough in the record and were well supported by the record. She further found that Green did not receive mental health treatment until October 2014. AR 24.

The ALJ gave no weight to Dr. Thomsen's November 2014 opinion that Green had a "marked and extreme impairment" in work-related functioning. AR 24. The ALJ concluded that Dr. Thomsen's opinion was uncorroborated by the record (including the "dearth" of treatment before October 2014), and as it was contradicted by Dr. Kollath's opinions and the opinion of Dr. Combs from October 3, 2014. *Id.* The ALJ discounted Dr. Thomsen's opinions as "advocacy" given that Green was referred to him by her legal representative. *Id.*

The ALJ dismissed the opinions of MFT McKenzie, concluding that she was not "an acceptable medical source" and her opinion was not supported "by the objective findings of the record and course of medical treatment." AR 24. The ALJ doubted that McKenzie acted as Green's psychotherapist because of the lack of treatment records from McKenzie. *Id.*

Next, the ALJ concluded that Green has the "residual functional capacity to perform light

work" and that Green can stand and walk for four hours in an eight-hour work day and can occasionally "climb ramps and stairs, climb ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl." AR 24.   The ALJ rejected Green's own testimony about her limitations (including that she can only walk about two to three blocks, uses a cane daily, uses walls to help her walk, has migraines three times a week that last for hours, has chronic pain, does not engage in physical activities, that her medication causes fatigue and nausea) because in the ALJ's view that testimony was inconsistent with Green's hearing testimony regarding her daily activities (including caring for her two children by herself, getting them to school, cleaning her house "a little bit," going out to doctor appointments or the liquor store three blocks away, and doing little household chores such as washing dishes, although she uses plastic and paper plates).  AR 25, 27.[3]

While finding that Green's medically determinable impairments could be expected to cause her symptoms, the ALJ rejected Green's testimony about the intensity, persistence, and limiting effects of them as not credible.  Regarding the medical evidence, the ALJ concluded that, while noting a history of complaints about chronic pain, since October 2012 there is only evidence of intermittent treatment for that pain and that Green did not seek treatment for her chronic pain between October 2012 and April 2014.  The pause in seeking treatment for her pain condition during this time, while she was pregnant, raised "doubts regarding [Green's] allegations of disabling chronic pain." AR 26.  The ALJ further concluded that the objective findings in the record did not support Green's allegations regarding her physical limitations and chronic pain, as x-rays were generally negative and showed no or limited evidence of disease, with only one showing a limited but severe case of  lumbar degenerative disc disease.  That one finding did not prove to the ALJ that Green was as limited as she contended.  *Id.*

The ALJ considered the two consultative examinations by Dr. Ayoubi and Dr. McMillan that showed minimal limitations, other than temporal ones caused by her second pregnancy in

---

[3] At the hearing, Green testified that her kids are picked up and dropped off by a shuttle, although she can occasionally make it the two blocks to one of her son's schools for occasional meetings, as long as he supports her on the way home.  AR 44-46.  She also testified that the family "lives out" of paper and plastic (to avoid washing dishes) and eats pre-cooked meals.  AR 48.  She also testified that she relies on transportation to get to her doctors and agency appointments.  AR 51.

2013.  AR 26. The ALJ found that Green's obesity limits her abilities to work, but is not disabling. AR 27.

In determining her RFC, the ALJ gave great weight to the DDS consultants who reviewed the record and concluded that Green could stand and walk four hours in a work day, and sit up to six hours, occasionally climb and frequently balance, stoop, kneel.  AR 27.  She gave no weight to Dr. Berteksen's 2008 exam and Dr. Aroubi's 2012 exam, both of which found her more limited, given their own conclusions that the examinations were incomplete and unreliable.  AR 28.

After reviewing Green's past work, and with the assistance of the Vocational Expert's testimony, the ALJ concluded that Green was capable of performing past work as a collection clerk and a data entry clerk, as well as work as an order caller, blueprint trimmer, and a laundry sorter.  AR 29-30.

## LEGAL STANDARD

### I.  ALJ EVALUATION OF DISABILITY

A claimant is "disabled" as defined by the Social Security Act if: (1) "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 1382 c(a)(3)(A)-(B); *Hill v. Astrue,* 698 F.3d 1153, 1159 (9th Cir.2012).  To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R § 404.1520(a)(4)(i)-(v).

In the first two steps of the evaluation, the claimant must establish that he or she (1) is not performing substantial gainful activity, and (2) is under a "severe" impairment.  *Id.* § 416.920(a)(4)(i)-(ii).  An impairment must have lasted or be expected to last 12 months in order to be considered severe.  *Id.* § 416.909.  In the third step, the claimant must establish that his or her impairment meets or medically equals a listed impairment described in the administrative regulations.  *Id.* § 416.920(a)(4)(iii).  If the claimant's impairment does not meet or equal one of

the listed impairments, before proceeding to the fourth step, the ALJ is to make a RFC

determination based on all the evidence in the record; this determination is used to evaluate the

claimant's work capacity for steps four and five. *Id.* § 416.920(e).

In step four, the claimant must establish that his or her impairment prevents the claimant

from performing relevant work he or she did in the past. *Id.* § 416.920(a)(4)(iv). The claimant

bears the burden to prove steps one through four, as "[a]t all times, the burden is on the claimant to

establish [his] entitlement to disability insurance benefits." *Id.* (alterations in original). Once the

claimant has established this *prima facie* case, the burden shifts to the Commissioner to show at

the fifth step that the claimant is able to do other work, and that there are significant number of

jobs in the national economy that the claimant can do. *Id.* §§ 416.920(a)(4)(v),(g); 416.960(c).

At step five, the Commissioner considers the RFC assessment, the claimant's age,

education, and work experience in order to determine if the claimant is able to perform other work.

20 C.F.R. § 416.920(a). The RFC assessment consists of the "physical and mental" limitations on

what a claimant can do as a result of his impairments. 20 C.F.R. § 416.945(a)(1). Then the ALJ

evaluates potential occupations that a claimant can perform. *See* 20 C.F.R. § 416.966.

## II.     STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I review the ALJ's decision to determine whether the ALJ's

findings are supported by substantial evidence and free of legal error. *See Smolen v. Chater,* 80

F.3d 1273, 1279 (9th Cir.1996); *DeLorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir.1991) (ALJ's

disability determination must be supported by substantial evidence and based on the proper legal

standards). Substantial evidence means "'more than a mere scintilla,' but less than a

preponderance." *Saelee v. Chater,* 94 F.3d 520, 521–22 (9th Cir.1996) (quoting *Richardson v.

Perales,* 402 U.S. 389, 401 (1971)). Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401

(internal quotation marks and citation omitted).

I must review the record as a whole and consider adverse as well as supporting evidence.

*See Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir.2006). Where evidence is susceptible

to more than one rational interpretation, the ALJ's decision must be upheld. *See Morgan v.*

*Comm'r of the Soc. Sec. Admin.,* 169 F.3d 595, 599 (9th Cir.1999). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Robbins,* 466 F.3d at 882 (quoting *Hammock v. Bowen,* 879 F.2d 498, 501 (9th Cir.1989)); *Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir.2007). Finally, if the legal error is harmless, then a reversal is unwarranted. *See Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir.2012) ("We may not reverse an ALJ's decision on account of an error that is harmless"). An error is harmless when it is "inconsequential to the ultimate non-disability determination." *Molina,* 674 F.3d at 1115 (citing *Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F.3d 1155, 1162 (9th Cir.2008)).

## DISCUSSION

Green contends that the ALJ erred in five significant ways: (i) failing to include Green's chronic pain, PTSD, Bulimia, and major depression among her severe impairments; (ii) rejecting the opinions of Green's treating, examining, and non-examining sources for insufficient reasons that are not supported by substantial evidence; (iii) failing to provide specific, clear, or convincing reasons for rejecting Green's subjective testimony; (iv) due to the previous three errors, the ALJ's RFC findings do not accurately reflect Green's limitations and are not supported by substantial evidence; and (v) the step five finding as to past and other work are erroneous and not based on substantial evidence.

## I.     THE ALJ'S FAILURE TO CONSIDER SEVERAL OF GREEN'S IMPAIRMENTS

I agree that the ALJ ignored the evidence of Green's diagnosed chronic pain, PTSD, bulimia, and major depression that severely impact her ability to perform work activities and will last for more than 12 months. Pl. Mot. 10.

### A.     The ALJ Failed to Adequately Address Green's Chronic Pain Syndrome

As to her chronic pain, Green contends that the ALJ "conflated" fibromyalgia, a specific type of pain syndrome, with chronic pain. *Id.* Green asserts that she did not allege fibromyalgia as the basis of her claim for benefits; rather, fibromyalgia was only a possible diagnosis by Green's medical providers. *Id.* She did, however, assert chronic pain as a severe impairment and that it hinders "her abilities to perform basic work activities." Green argues that her chronic pain

is well documented in the record, including the diagnoses of and treatment by Dr. Kornfeld/P.A. Smith at Highland Hospital's chronic pain clinic from 2008 through 2012, and Dr. Fitzgerald from 2014 on.  AR 363-373 (2011-2012), 374-375, 534-535 (2005-2009).  In each of plaintiff's treatment notes, the doctors report how Green's pain limits her activities.  The Commissioner responds that even if the ALJ erred by not identifying Green's chronic pain as a severe impairment, the ALJ did discuss Green's chronic pain later in the decision, and therefore at worst committed a harmless error. Oppo. 3.

There is no doubt the ALJ erred in failing to consider plaintiff's chronic pain syndrome as severe, despite the record containing numerous statements and opinions by treating physicians Drs. Fitzgerald and Kornfeld, as well as PA Smith, who observed that Green's chronic pain limits her abilities to care for herself and her children.  To be sure, later in her opinion the ALJ considered Green's complaints of chronic pain but discounted their severity because Green was not treated for chronic pain from October 2012 through April 2014 when Green stopped taking pain medications during her pregnancy and during the first year after her child was born.  AR 25-26.  According to the ALJ, this raised "doubts" regarding Green's allegations of disabling pain.  However, the ALJ conducted no analysis and sought no input on the significant levels of medication Green had been taking and physical therapy Green had been receiving from the pain management clinic as of October 2012 and then resumed in 2014.  That Green stopped taking the *narcotic* medicines during this time (which is all the evidence and her testimony shows) does not mean she was not taking other medications and that did not still have chronic pain syndrome.  Green's post-partum records state that she *had* "[c]hronic pain syndrome without narcotics during this pregnancy."  AR 741.

The ALJ also discounted Green's complaints of chronic pain because of a lack of objective evidence, including mostly negative MRIs except for degenerative disc disease and two consultative evaluations that were either inconclusive or found her to be mildly limited.  AR 26-27.  But the ALJ never fully engaged with an analysis of the treatments and significant levels of medications she received from the pain management clinic.

Finally, the ALJ discounted the allegations of chronic pain because of Green's daily life

16

activities.  But the ALJ mischaracterized the extent of Green's daily life activities, as discussed

below.  The ALJ's failure to assess Green's chronic pain syndrome as severe and to fully engage

with that diagnosis was error.[4]

### B. The ALJ Failed to Address Green's Diagnoses of Depression, Bulimia, and PTSD.

Even more problematic, the ALJ erred by failing to include Green's major depression,

bulimia, and PTSD as severe impairments, despite the fact that there is significant if not

uncontested evidence in the record that these long-standing impairments are not only severe but

also impact Green's ability to perform work activities and will last for more than 12 months.

The Commissioner argues that the ALJ did acknowledge that Green had been diagnosed

with depression, bulimia, and PTSD but appropriately discounted them and found them non-

severe because "the record shows that prior to October 2014, Plaintiff had not received any mental

health treatment" and that plaintiff had at most "mild limitations" caused by her mental

impairments.  The Commissioner (and the ALJ) are simply wrong concerning the record as of

October, 2014.  Plaintiffs' depression and bulimia were acknowledged in *2007* (AR 582 [noting

history of depression and bulimia in 2007]), and consistent diagnoses of depression and bulimia

were noted in 2011 through 2013.  *See, e.g*., AR 740.  The evidence also shows that plaintiff *had*

been receiving mental health treatment well before 2014.  This included prescriptions for valium

and other anti-anxiety medications.  AR 560, 564, 568 (valium and chlordiazepoxide in 11/2011,

4/2012, 9/2012).  Green also received "psychoeducational" counselling in connection with the

services she received at the pain management clinic.  AR 578 (August 2011), AR 574-75

(September 2011), AR 580 (August 2011), 663 (July 2012).[5]  Finally, MFT McKenzie had been

seeing Green on every two weeks since February 2014 to provide mental health treatment.  AR

---

[4]  The facts of this case distinguish it from *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) relied on by the Commissioner.  In *Lewis*, although the ALJ failed to consider the claimant's bursitis as a severe impairment, the ALJ nonetheless "extensively discussed" it at Step 4 and took into account the limitations from that condition in setting the RFC.  *Id*. at 911.

[5]  As plaintiff notes, the Ninth Circuit has "criticized the use of a lack of treatment to reject mental complaints" as "mental illness is notoriously underreported." *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–300 (9th Cir. 1999).

17

800.

As to the "mild" limitations resulting from any mental health conditions the ALJ failed to consider severe, the Commissioner relies on the two consultative evaluations by Dr. Kollath in 2010 and 2013, assessing GAF scores of 65 and 75 respectively. Oppo. at 4. Green's consultative examiner, Dr. Thomsen, made numerous important criticisms of Kollath's testing and conclusions. AR 787. For example, Thomsen noted that Kollath's 2010 intelligence testing shows only "borderline," not average, functioning, and that Kollath did not test emotional functioning, and the 2013 Kollath examination did not involve any psychological testing. AR 787. The ALJ did not address these criticisms in her wholesale acceptance of Kollath's findings.[6] Moreover, the Commissioner cites to no evidence in the record to show that plaintiff's mental health conditions were in fact mild as demonstrated by her daily life activities (or reports to physicians, etc.).

Finally, the Commissioner argues that the opinions from October and November 2014 that Green had serious mental health conditions, including depression, bulimia, and PTSD, did not satisfy the durational limit because those opinions only indicated that Green's mental health condition had worsened recently. To the contrary, both Dr. Thomsen and MFT McKenzie explained in depth their opinions that Green had suffered continued to suffer from these severe conditions for many years. AR 795-796, 800-801.

The ALJ committed multiple errors in failing to address and engage with Green's severe chronic pain syndrome, depression, bulimia, and PTSD. Remand is warranted for further proceedings on this ground alone.

## II.    REJECTING OPINIONS OF GREEN'S TREATING AND EXAMINING SOURCES AND GREEN'S OWN TESTIMONY

### A.    Treating and Examining Sources

Although I need not reach this issue and may remand for further proceedings based on the ALJ's significant errors addressed above, I briefly address some of Green's additional arguments

---

[6] The Commissioner also relies on the "unremarkable" mental status examinations from three Emergency Department visits Green made during 2011 and 2012, which note only that Green had clear speech, was oriented, with a normal affect, and appropriately responded to questions. Compare Oppo. at 4 with AR 626, 627, 632.

18

that the ALJ also erred in rejecting the opinions of her treating and examining sources. Mot. at 11-16.

Generally, with respect to the doctors and physician assistant Green saw for her chronic pain syndrome (Kornfeld, Fitzgerald, Smith), the Commissioner attempts to draw a distinction between the treatment notes from those sources and the lack of opinions from them that Green's pain limited her ability to work. *See, e.g.,* Oppo. at 7-9. That none of those sources submitted a formal opinion concerning whether Green was able to work given her pain syndrome does not mean that the ALJ (and the Commissioner here) can ignore the notes in those treatment records that indicate that Green was significantly limited in her daily life activities by her pain syndrome.

More specifically, the ALJ improperly discredited the opinions of treating therapist MFT McKenzie and examining psychologist Thomsen. With respect to MFT McKenzie, the ALJ rejected McKenzie's December 2014 opinions that Green had marked limitations in her abilities to function (including ability to understand, remember and carry out detailed instructions, ability to maintain attention and concentration for a two-hour segment, ability to adhere to a schedule and complete a normal workday). AR 803-808. While McKenzie, as a therapist, is not entitled to as much deference as "an acceptable medical source," the ALJ was still required to provide "germane" reasons for discrediting her opinions. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). The reasons the ALJ gave for discrediting McKenzie's opinions were that there that her opinion was "unsupported by the objective findings of record and course of medical treatment" and that there were no "treatment records" to show she was Green's psychotherapist. AR 24. However, McKenzie's opinions were consistent with Thomsen's. Moreover, McKenzie provided a detailed letter explaining the psychotherapy services she had been providing to Green every two weeks since February 2014. AR 800. There is nothing in the record contradicting those facts. Nor does the ALJ point to *any evidence* in the record, either from February through November 2014 or before, that contradicts any of McKenzie's opinions based on her treatment of Green. The ALJ did not provide germane reasons to discount McKenzie's opinions.

The ALJ rejected Thomsen's detailed psychological report and opinions finding that Green had significant and marked limitations because they were "uncorroborated" by the record, namely

the dearth of mental health treatment prior to 2014. However, as noted above, Green received mental health treatment before 2014; that a claimant was not in active treatment cannot be used to discount diagnosed mental health conditions. *Regennitter,* 166 F.3d at 1299–1300. The ALJ also discounted Thomsen's opinions because they were contradicted by Kollath. AR 23-24. But Thomsen made specific criticisms about Kollath's opinions (and lack of testing). Thomsen also performed a more thorough examination. Neither of these points was addressed, much less analyzed and resolved, by the ALJ. The ALJ also discounted Thomsen's opinions that Green was limited in social functioning because Kollath and Combs' observed that Green had good eye contact and was cooperative during their examinations. AR 24. Those limited observations of eye contact and cooperativeness are no substitute for Thomsen's more thorough analysis of the issue.[7]

**B.      Green's Testimony**

Finally, the ALJ erred in discounting Green's testimony about her daily activities and limitations. Green asserts that the "ALJ's proffered reasons for discrediting [Green's] testimony are difficult to discern, are not clear and convincing and not supported by substantial evidence from the record." Mot. 17. The Commissioner responds generally and states that the ALJ's discrediting Green is supported by the record. Oppo. 9-10.

Repeatedly, the ALJ discounted Green's testimony about the significance of her pain and the extent of her limitations, specifically discrediting Green's testimony that she can only walk a few blocks, uses a cane, has significant migraines weekly, and suffers from nausea and fatigue as a result of her medications. AR 25. The ALJ seemed to find significant that Green admitted that she is the sole caretaker of her two children and has little outside support. AR 23, 25. The ALJ also noted that Green "gets the children to school," cleans the house "a little bit," is able to wash dishes, and goes out to doctor's appointments or the liquor store. AR 25, 27. The ALJ also noted

---

[7] The ALJ's last point, that Thomsen's opinion must be discounted because it is "advocacy" as Green was referred to Thomsen by counsel, is likewise without basis absent some evidence that Thomsen's opinions are cut from whole cloth. The ALJ points to no specific evidence in the record to undermine Thomsen's opinions, other than Kollath's opinions which were challenged but not addressed by the ALJ. *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998) ("the mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report").

that at one appointment, Green had her toddler son with her, "suggesting that she was watching him even during the day." AR 27. The ALJ mischaracterizes Green's testimony.

At the hearing, Green testified that her kids are picked up and dropped off by a shuttle for their school and daycare. She testified that she can occasionally make it the two blocks to one of her son's schools for meetings, as long as he "supports" her on the way home. AR 44-46. She also testified that the family "lives out" of paper and plastic (to avoid washing dishes) and eats pre-cooked meals. AR 48. She relies on transportation to get to her doctor's and agency appointments. AR 51. The liquor store, where she goes occasionally, is three blocks away. AR 47. This testimony is not, on its face, inconsistent with her testimony regarding her own limitations.[8] The ALJ did not identify "specific, clear and convincing reasons" for rejecting Green's testimony as to her limitations based on her own testimony. *Reddick*, 157 F.3d at 722.

## CONCLUSION

Because the ALJ's errors – in failing to recognize and analyze all of Green's severe conditions and impermissibly discounting of Green's sources – led to an incorrect RFC determination and Step 5 analysis, I need not reach plaintiff's arguments on those grounds.

The ALJ committed reversible error by not considering Green's chronic pain, PTSD, bulimia, and depression, as well as rejecting Green's treating and examining sources. I GRANT Green's motion, DENY the Commissioner's motion, and REMAND this case for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: September 21, 2017

William H. Orrick
United States District Judge

---

[8] The ALJ also noted that Green testified that she has to lie down and stays in bed for multiple days during the week, but does not provide a cite to that testimony. AR 27. At the hearing, Green testified that when she was depressed/exhausted, she would be able to get the kids up and ready for school and then she goes back to bed. AR 50.

21